Leslie A. Cohen, Esq. (SBN: 93698)
            leslie@lesliecohenlaw.com
J'aime K. Williams (SBN: 261148)
            Jaime@lesliecohenlaw.com
LESLIE COHEN LAW, PC
506 Santa Monica Bl., Ste 200
Santa Monica, CA 90401
Telephone:  (310) 394-5900
Facsimile:  (310) 394-9280

[Proposed] Counsel for
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

In re

PHILLIPS CATTLE COMPANY, INC.,

        Debtor and Debtor-in-Possession

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:10-bk-25276

Chapter 11

**DEBTOR'S EMERGENCY MOTION TO APPROVE USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF PHILIP E. BAUER IN SUPPORT THEREOF**

Date:      April 22, 2010
Time:        2:00 p.m.
Courtroom: 1475

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

**PAGE**

I.    STATEMENT OF FACTS ........................................................................................    2
      A.    The Debtor ................................................................................................    2
      B.    The Debtor's Assets and Liabilities..........................................................    2
      C.    The Debtor's Financial Performance .......................................................    2
      D.    The Debtor's Financial Difficulties ...........................................................    2
      E.    Secured Claims Asserted Against Debtor's Cash Collateral....................    3
      F.    Cash Collateral Balance ..........................................................................    4
      G.    The Debtor's Cash Collateral Proposal ...................................................    4
            1.    Budget ............................................................................................    4
            2.    Replacement Lien...........................................................................    5
            3.    Reservation of Rights .....................................................................    5
            4.    Financial Reporting.........................................................................    5
            5.    Final Hearing on this Motion ..........................................................    5

II.   COMPLIANCE WITH F.R.B.P. 4001(c) and L.B.R. 4001-2 ................................    5

III.  SUMMARY OF ESSENTIAL TERMS ....................................................................    6

IV.   THE DEBTOR SHOULD BE AUTHORIZED TO USE ANY CASH
      COLLATERAL OF THE LENDER PURSUANT TO 11 U.S.C. § 363....................    6
      A.    The Adequate Protection Burden .............................................................    8
      B.    The Debtor Has Satisfied Their Adequate Protection Burden..................   10
            1.    The Lender's Interests Are Adequately Protected by
                  the Proposed Replacement Liens..................................................   10
            2.    The Lender Is Adequately Protected by the Maintenance
                  Preservation of the Debtor's Business...........................................   11

V.    GOOD CAUSE EXISTS FOR HEARING THIS MOTION ON
      AN EMERGENCY BASIS ......................................................................................   12

VI.   THE COURT SHOULD SCHEDULE A FINAL HEARING ON THIS
      MOTION AS SOON AS POSSIBLE IN ACCORDANCE WITH
      THE REQUIREMENTS OF THE BANKRUPTCY RULES ...................................   13

VII.  THE NOTICE OF THIS MOTION PROPOSED TO BE GIVEN TO
      CREDITORS AND OTHER PARTIES-IN-INTEREST IS
      APPROPRIATE UNDER THE FACTS AND CIRCUMSTANCE
      OF THE DEBTOR'S CASE.....................................................................................   14

VIII. CONCLUSION  ......................................................................................................   14

1

# TABLE OF AUTHORITIES

2

**PAGE**

3

## Cases

4

In re Anderson, 86 B.R. 877, 889 (Bankr. N.D. Ind. 1988)................................................. 9

5

In re Cann & Saul Steel Co., 76 B.R. 479, 483 (E.D. Pa. 1987) ...................................... 12

6

In re Center Wholesale, Inc., 759 F.2d 1440, 1449 n.21 (9th Cir. 1985)........................... 13

7

In re Century Inv. Fund, VII Ltd. Partnership, 96 B.R. 884, 887 (Bankr. E.D. Wis. 1989) ............... 9

8

In re Delta Resources, Inc., 54 F.3d 722, 730 (11th Cir.), cert. denied, 64 U.S.L.W. 3348
        (1995) ........................................................................................................................ 9

9

In re Elmore, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988) .................................................. 9

10

In re Glasstream Boats, Inc., 110 B.R. 611, 612 (M.D. Ga. 1990) ................................... 12

11

In re Johnson, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) ................................................. 9

12

In re Karl A. Neise, Inc., 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981).................................. 12

13

In re Kessler, 86 B.R. 134, 136 (Bankr. C.D. Ill. 1988) ................................................... 9

14

In re Kidsstop of America, Inc., 64 B.R. 397, 401 (M.D. Fla. 1986) ................................. 11

15

In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990) ....................... 8

16

In re Martin, 761 F.2d 472 (8th Cir. 1985).......................................................................... 11

17

In re McCombs Properties VI, Ltd., 88 B.R. 261 (Bankr. C.D. Cal. 1988) ................. 8, 9, 10, 11, 12

18

In re Pine Lake Village Apartment Co., 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982)........... 12

19

In re Stein, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982)........................................................ 12

20

In re Sullivan Ford Sales, 2 B.R. 350, 355 (Bankr. D.Me. 1980)....................................... 13

21

In re Westchase I L.P., 126 B.R. 692, 694-95 (W.D.N.C. 1991) ..................................... 9

22

Ledgemore ......................................................................................................................... 10

23

Timbers8, 9, 10

24

United Savings v. Timbers of Inwood Forest, 484 U.S. 365, 108 S.Ct. 626 (1988) ....................... 8

25

26

27

28

1

**Statutes**

2

§ 363(e) ................................................................................................................................ 9

3

§§ 361  10

4

11 U.S.C. § 506(a) ............................................................................................................ 11

5

362(d)(1) ........................................................................................................................ 8, 10

6

Section 363 (c)(2) ............................................................................................................... 7

7

Section 363(c)(3) .............................................................................................................. 12

8

Section 363(e) ................................................................................................................. 8, 9

9

Sections 361 ....................................................................................................................... 8

10

**Rules**

11

Rule 4001 .................................................................................................................... 13, 14

12

**Treatises**

13

Collier on Bankruptcy 15th Ed. Revised, ¶ 552.02[1] (1998) ........................................... 8

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1     TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE

2 OF THE UNITED STATES TRUSTEE; SECURED CREDITORS, AND THE TWENTY LARGEST

3 UNSECURED CREDITORS:

4     Phillips Cattle Company, Inc., a California corporation, the debtor and debtor-in-possession herein

5 (the "Debtor"), hereby moves the Court, on an emergency basis, for an order (i) authorizing the Debtor to use

6 any cash collateral of any secured creditors holding security interests in cash collateral, and to grant to such

7 secured creditors post-petition replacement liens as and for adequate protection of the Debtor's use of any

8 cash collateral of such secured creditors, on the terms set forth herein; and (ii) setting a final hearing on this

9 Motion.

10     This Motion is made and based upon the foregoing allegations and representations, the

11 Memorandum of Points and Authorities and the Declaration of Philip E. Bauer (the "Bauer Declaration")

12 attached hereto, the papers, pleadings and other documents on file in the Debtor's Chapter 11 case, and

13 upon such other evidence, both oral and documentary, that may be submitted to the Court at or before the

14 time of the hearing on this Motion.

15     WHEREFORE, the Debtor requests that this Court enter its order:

16     1.    Authorizing the Debtor's immediate use of any cash collateral of secured creditors

17 holding security interests in cash collateral, pursuant to the terms and conditions contained in this

18 Motion, pending a final hearing on notice to creditors;

19     2.    Setting a final hearing on this Motion; and

20     3.    Granting to the Debtor such other and further relief as may be just and appropriate in

21 accordance with the circumstances of this case.

22 Dated: April 21, 2010                        Leslie Cohen Law, PC

23

24                                       */s/ Leslie A. Cohen*

25                                  Leslie A. Cohen

26                                  [Proposed] Counsel for Debtor and Debtor-in-Possession

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

**A.    The Debtor**.

The Debtor, established in 1968, operates a 100 acre cattle yard and feed mill located in El Centro, California where it processes and sells feed to other cattle dealers, fattens other dealers' livestock, and produces its own livestock for wholesale.  The Debtor's clients consist primarily of other livestock owners and commercial packing houses.  The Debtor does not retail directly to the public.  The Debtor's competitors include other livestock producers such as Brandt Beef.

Philip E. Bauer is the Debtor's president.  Jerome Bauer is the Debtor's vice president, secretary, and treasurer.  Ross Jenkins, the Debtor's general manager and chief operating officer, runs the day-to-day operations of the Debtor.  Denise Matejovsky, the Debtor's controller, maintains the Debtor's books and records.  Joan Bauer and Sandra Ramalho each own 50% of the Debtor's outstanding common stock.

The Debtor operates the cattle yard on land leased from the Philip Himmelfarb Trust.  The Debtor's headquarters is located in Beverly Hills, California in premises leased from Maple Plaza, and its administrative office is located in Imperial, California in premises leased from Western Meat Processors, an affiliated entity.  The Debtor currently employs approximately 29 employees.

**B.    The Debtor's Assets and Liabilities**.

The Debtor currently has current assets of approximately $8 million which consists primarily of receivables, inventory, and cash on hand. The Debtor currently has liabilities of approximately $19.8 million which consists primarily of notes payable to Wells Fargo Bank ("Wells Fargo").

**C.    The Debtor's Financial Performance**.

During the nine month period ending January 31, 2010, the Debtor had over $11 million in sales. Based on the Debtor's historical financial performance, the Debtor has prepared a cash flow budget, which is attached as Exhibit "1" to the Bauer Declaration.

**D.    The Debtor's Financial Difficulties**.

The Debtor's financial difficulties were primarily caused by its being defrauded in late 2009 by a large customer, Dwight Mebane ("Mebane").  Previously, the Debtor and Mebane had engaged in business

1   dealings where the Debtor would finance Mebane's purchase of cattle that would initially be placed in

2   Mebane's pastures until the cattle reached a certain weight.  Thereafter, the cattle would be transferred to the

3   Debtor's yard for further feeding until sold to packing houses.  Once sold, the Debtor would remit the sale

4   proceeds to Mebane, less the amount loaned to Mebane and less the amounts due the Debtor for feed

5   provided.  Over the period November 2004 to June 2009, the Debtor loaned $11 million in proceeds from a

6   revolving line of credit from Wells Fargo Bank to Mebane to finance Mebane's purported purchase of 20,000

7   head of cattle.   In one of Wells Fargo's biennial appraisals of the Debtor's assets in about October 2009,

8   Wells Fargo's appraiser inspected Mebane's pasture in Woody, California and indicated that 5,000 of

9   Mebane's Debtor financed cattle was located there.  After Mebane failed to transfer his cattle to the Debtor for

10  final feeding, the Debtor investigated Mebane's pastures and found none of the supposed 20,000 cattle

11  purchased with the $11 million provided by the Debtor.   The 5,000 cattle Wells Fargo's appraiser indicated

12  he had observed at Mebane's pasture did not bear Phillips' brand and in fact belonged to a third party.  In

13  November 2009, Mebane filed a chapter 11 case that is pending before the U.S. Bankruptcy Court for the

14  Eastern District of California, case no. 09-61122-A-11.  Mebane's fraud has caused the Debtor at least $11

15  million in losses and has harmed its business.

16          **E.    Secured Claims Asserted Against Debtor's Cash Collateral**.

17          The Debtor believes that the only creditor that asserts a security interest against the Debtor's cash

18  collateral is Wells Fargo Bank (the "Lender").  On or about October 18, 2007, the Debtor entered into a letter

19  agreement with Wells Fargo under which the Lender agreed to loan and the Debtor agreed to borrow up to

20  $21 million in two revolving lines of credit of $11 million and $10 million each (the "Wells Fargo Loan

21  Agreement"), each under a separate note with a principal balance of up to $11 million and $10 million

22  respectively, due on November 1, 2008, that bears interest at either prime less .5% or LIBOR plus 1.6% (the

23  "Wells Fargo Notes").  The Wells Fargo Notes are secured by a lien on the Debtor's livestock, accounts

24  receivable, and inventory under a security agreement and a livestock security agreement.  The Wells Fargo

25  Loan is guaranteed by the Philip Himmelfarb Testamentary Trust u/t/d 4/9/97.

26          On or about October 29, 2007, the Debtor entered into an amendment to the Wells Fargo Loan

27  Agreement under which the Lender agreed to loan and the Debtor agreed to borrow up to an additional $1

28  million in a revolving line of credit of $1 million to finance the Debtor's hedging activities with respect to cattle

owned by the Debtor's customers, under a note with a principal balance of up to $1, due on November 1,

2008, that bears interest at prime less .5% ("Wells Fargo Hedging Notes").  The Wells Fargo Hedging Notes

are secured by a lien on certain securities accounts of the under a pledge agreement.  The Wells Fargo

Notes and Wells Fargo Hedging Notes are collectively referred to as the Wells Fargo Loan.

On or about October 28, 2008, the Wells Fargo Loan was amended to extend the maturity date to

November 1, 2009 and on or about October 27, 2009, the Wells Fargo Loan was amended to extend the

maturity date to November 1, 2010.

**F.    Collateral Balance**

As of the Petition Date, the Debtor's collateral balance is as follows:

Cash - $140,000
Accounts Receivable - $3,390,000
Inventory - $4,500,000

**G.    The Debtor's Cash Collateral Proposal.**

The Debtor proposes to use funds claimed as cash collateral by the Lender in connection with the

continued operation of the Debtor's business, in accordance with the provisions of the Debtor's cash flow

budget attached as Exhibit "1" to the Bauer Declaration.  The Debtor proposes to use any cash collateral of

the Lender pursuant to the terms and conditions set forth below:

1.    Budget.  The Debtor will be authorized to make the expenditures provided for in the

budget monthly, and if necessary, to exceed the amounts set forth the budget by as much as 15% of budget

total; however, if the Debtor's revenues increase, then the Debtor's expenditures may exceed the amount of

the expenditures set forth in the budget in proportion to the increase in actual revenues from budgeted

revenues.  Any expenditure in excess of this authorization will require the written approval of the Lender, or

further order of the Court after appropriate notice.  Budget savings in any month may be carried over and

used by the Debtor in subsequent months (i.e., to account for changes in the timing of expenditures by the

Debtor).  After the expiration of the term of the budget, the Debtor will be able to obtain use of any cash

collateral of the Lender by filing and serving an amended budget; if no objection to the terms of such budget

is filed within ten (10) days after the service of such budget, the budget will be deemed to have been

approved.

2.    <u>Replacement Lien</u>.  As and for adequate protection of the Debtor's use of any cash collateral of the Lender, the Lender will be granted replacement liens in the Debtor's post-petition cash, accounts receivable and inventory, and the proceeds of each of the foregoing, to the same extent and priority as any duly perfected and unavoidable liens in cash collateral held by the Lender as of the Petition Date, limited to the amount of any cash collateral of the Lender as of the Petition Date, to the extent that any cash collateral of the Lender is actually used by the Debtor.

3.    <u>Reservation of Rights</u>.  The Debtor and all other parties-in-interest will reserve any and all rights that they may have to object to the claims of the Lender and to object to the validity, priority and extent of the Lender's liens, if any, encumbering the Debtor's assets.

4.    <u>Financial Reporting</u>.  The Debtor will provide to the Lender all interim statements and operating reports required to be submitted to the Office of the United States Trustee, and monthly cash flow reports, broken down by the expense line items contained in the budget, within 25 days after the end of each monthly period after the Petition Date.

5.    <u>Final Hearing on this Motion</u>.  The Debtor reserves the right to seek, at the final hearing on this Motion, use of cash collateral different from that set forth herein.

Based upon the budgets set forth on Exhibit "1," the Debtor believes that this Court should authorize the Debtor's continued use of cash collateral in connection with their ongoing business operations.

## II.

## <u>COMPLIANCE WITH F.R.B.P. 4001(c) and L.B.R. 4001-2</u>

Pursuant to FRBP 4001(c)(1)(B) and LBR 4001-2(b), the Debtor submits that the relief requested pertaining to the Debtor's proposed use of cash collateral does not contain any of the following Provisions.

(i)    a grant of priority or a lien on property of the estate under § 364(c) or (d);

(ii)    a determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim;

(iii)    a  prepetition secured debt to be post-petition debt or that use post-petition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(iv)    a waiver or modification of Code provisions or applicable rules relating to the automatic stay;

(v)    a waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363(c), or request authority to obtain credit under § 364

(vi)    the establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order;

(vii)    a waiver or modification of the applicability of non-bankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien;

(viii)    a release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action;

(ix)    the indemnification of any entity;

(x)    a release, waiver, or limitation of any right under § 506(c); or

(xi)    the granting of a lien on any claim or cause of action arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a), or 724(a).

(xii)    A grant of cross-collateralization protection;

(xiii)    Provisions or findings of that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor;

(xiv)    Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien;

(xv)    Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law;

(xvi)    Provides disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out; or

(xvii)    Primes any secured lien.

7

## III.

## SUMMARY OF ESSENTIAL TERMS

The Essential Terms are as follows:

1.  Interim Borrowing Limit: Not applicable.

2.  Maximum Borrowing Available on a Final Basis: Not applicable.

3.  Borrowing Conditions: Not Applicable

4.  Interest Rate: Not applicable

5.  Maturity Dates: Not applicable.

6.  Events of Default: Not applicable.

7.  Use of Funds Limitation:  Pursuant to Budget attached hereto as Exhibit 1.

8.  Protections Afforded under 11 U.S.C. §§ 363 and 364: the Lender will be granted replacement liens in the Debtor's post-petition cash, accounts receivable and inventory, and the proceeds of each of the foregoing, to the same extent and priority as any duly perfected and unavoidable liens in cash collateral held by the Lender as of the Petition Date, limited to the amount of any cash collateral of the Lender as of the Petition Date, to the extent that any cash collateral of the Lender is actually used by the Debtor.

## IV.

## THE DEBTOR SHOULD BE AUTHORIZED TO USE ANY

## CASH COLLATERAL OF THE LENDER PURSUANT TO 11 U.S.C. § 363

The provisions of Section 363(c)(2) of the Bankruptcy Code govern a debtor's use of cash collateral. Section 363 (c)(2) provides, in pertinent part, as follows:

> The trustee [or debtor in possession] may not use, sell or lease cash collateral.... unless:
> (A)     each entity that has an interest in such cash collateral consents; or
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

Therefore, a court may authorize a debtor's use of a creditor's cash collateral in the absence of creditor consent.  See, 11 U.S.C. § 363(e).

1      Section 363(e) of the Bankruptcy Code provides that, upon the request of an entity that has an

2   interest in property proposed to be used by the debtor, the court may prohibit or condition such use "as is

3   necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

4      The Bankruptcy Code clearly delineates the party which bears the burden of proof on the relevant

5   cash collateral issues:

6          (1)      the trustee [or debtor in possession] has the burden of proof on the issue of adequate

7                    protection; and

8          (2)      the entity asserting an interest in property has the burden of proof on the issue of the validity,

9                    priority, or extent of such interest.

10   11 U.S.C. § 363(o).

11      Therefore, this Court may authorize the Debtor's use of any cash collateral of the Lender upon

12   determining that the interests of the Lender in the cash collateral will be adequately protected.  In re

13   McCombs Properties VI, Ltd., 88 B.R. 261 (Bankr. C.D. Cal. 1988).

14          A.      The Adequate Protection Burden.

15      In the case, United Savings v. Timbers of Inwood Forest, 484 U.S. 365, 108 S.Ct. 626 (1988), the

16   United States Supreme Court analyzed and quantified the parameters of the "interest in property," referenced

17   in Sections 361, 362(d)(1), and 363(e), which the Bankruptcy Code undertakes to protect, where required,

18   through adequate protection.  This analysis led the Supreme Court in Timbers to the conclusion that the

19   "interest in property" referenced in the above sections of the Bankruptcy Code means, and is limited to, the

20   "value of the Collateral."  Timbers, 108 S.Ct. at 630.  Therefore under the Timbers analysis, the adequate

21   protection provisions in the Bankruptcy Code protects a secured creditor only from a potential diminution in

22   the value of that creditor's collateral during the post-petition period.  Id.

23      The "value" oriented adequate protection analysis adopted by the Supreme Court in the Timbers

24   case has been closely adhered to by the courts which have subsequently had occasion to address this issue.

25   See e.g., In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (so long as the receivables

26   being collected and used by the debtor are being replaced by sufficient new receivables in which the creditor

27   is granted a security interest, the creditor is adequately protected);  In re Johnson, 90 B.R. 973, 978 (Bankr.

28   D. Minn. 1988) (secured creditor is not impaired and is not entitled to receive adequate protection payments

1    where value of collateral does not decline); In re Century Inv. Fund, VII Ltd. Partnership, 96 B.R. 884, 887

2    (Bankr. E.D. Wis. 1989) (where value of collateral appears to be stable, secured creditor is not entitled to

3    adequate protection payments); In re Anderson, 86 B.R. 877, 889 (Bankr. N.D. Ind. 1988) (secured creditor

4    was required to show a necessity for adequate protection by demonstrating a decline in asset value from the

5    petition date); In re Kessler, 86 B.R. 134, 136 (Bankr. C.D. Ill. 1988) (under Timbers, movants are not entitled

6    to adequate protection payments, as there was no showing that property was depreciating in value).

7            In In re Elmore, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988), the Honorable Samuel Bufford held that:

8            [T]he Court finds that the property is not depreciating in value.  In consequence, the Court
9            finds that Lomas [Secured Creditor] is adequately protected by the value of its collateral…
             The right to receive payments is a simple contract right, that supports only a claim in the
10           bankruptcy case.  There is no other adequate protection to which Lomas is entitled under the
             Bankruptcy Code.
11   Elmore, supra, 94 B.R. at 677 (citation omitted).

12           In In re McCombs, the Honorable John E. Ryan held that:

13           The analysis of the Supreme Court in Timbers is instructive here.  The phrase "interest in
14           property" in § 363(e) means the value of the collateral.  That is the interest that I am required
             to protect.  If that value is likely to diminish during the time of the use, adequate protection
15           must be provided by the Debtor.

16   McCombs, supra, 88 B.R. at 266 (emphasis added).  Accord, In re Delta Resources, Inc., 54 F.3d 722, 730

17   (11th Cir.), cert. denied, 64 U.S.L.W. 3348 (1995); In re Westchase I L.P., 126 B.R. 692, 694-95 (W.D.N.C.

18   1991).

19           Under the strict value-oriented analysis adopted by the Supreme Court in Timbers (and adhered to

20   by the well-reasoned cases cited above), the adequate protection inquiry under Section 363(e) is limited to

21   determining whether the debtor's use of a secured creditor's cash collateral will reduce the value of the

22   creditor's collateral base.  If the debtor can establish that the proposed use of the collateral will not cause a

23   decline in the value of the collateral, then court authorization of such use is appropriate.

24           Not infrequently, a secured creditor will contend that it somehow has a right to be paid adequate

25   protection payments, post-petition, even where no decline in the value of the collateral is either occurring or

26   anticipated.  The Supreme Court in Timbers expressly rejected this very contention stating:

27           It is obvious (since §§ 361 and 362(d)(1) do not entitle the secured creditor to immediate
28           payment of the principal of his collateral) that this "realization" is to "result" not at once, but

10

1   only upon completion of the reorganization.  It is then that he must be assured "realization …
    of the indubitable equivalent" of his collateral.
2   Timbers, 108 S.Ct. at 633.

3       The law, then, is clear:  no adequate protection payments are required unless there is a decline post-

4   petition in the value of the secured creditor's collateral which actually impairs the creditor's secured claim.  As

5   set forth in detail below, and as evidenced by the Declaration, the Debtor's proposal to use any cash

6   collateral of the Lender provides adequate protection to the Lender.

7       **B.    The Debtor Has Satisfied its Adequate Protection Burden**

8           1.    The Lender's Interest Is Adequately Protected by the Proposed Replacement Liens.

9       Under the Debtor's cash collateral proposal, the Lender's interests in any cash collateral will be

10  adequately protected from a diminution in value through replacement liens granted to the Lender and through

11  the maintenance and preservation of the Debtor's business.

12      Under the Debtor's proposal, the Lender will be granted a post-petition replacement lien on cash,

13  accounts receivable, inventory, and proceeds acquired and/or generated with any cash collateral with a value

14  equal to the amount of any pre-petition cash collateral expended by the Debtor.  For example, if the Debtor

15  uses $100,000 of pre-petition cash collateral, the Lender will be granted a lien, to the extent of $100,000, in

16  the proceeds of the cash collateral.

17      However, since the function of adequate protection is only to preserve and not to increase the

18  collateral subject to a secured creditor's interest, any additional value created through the Debtor's use of the

19  cash collateral, whether in the form of inventory, accounts receivable or cash, will not be subject to a

20  replacement lien, but will instead constitute an asset of the estate that all creditors will ultimately be able to

21  look for payment.  See, Ledgemore, supra, 116 B.R. at 343 (so long as the receivables being collected and

22  used by the debtor are being replaced by sufficient new receivables in which the creditor is granted a security

23  interest, the creditor is adequately protected).  Thus, the Lender's replacement liens should be limited to the

24  amount of any cash collateral in existence as of the Petition Date.

25      Although the replacement lien will, in concept, ensure the preservation of the Lender's interest in the

26  cash collateral, in reality, the liens will perform this function only if the Debtor, in fact, generate at least one

27  dollar of value for every dollar of cash collateral expended.  The evidence that addresses this issue is

28  contained in the Bauer Declaration and specifically the budget, which is attached as Exhibit "1" to the Bauer

                                    11

1 Declaration.  The budget indicates that the Debtor will operate on a cash flow positive basis during the
2 budgeted period, and that its assets will increase in value during such period.

3        The Debtor believes that the projections of their business operations as set forth in the budget are
4 reasonable.  As set forth in the Bauer Declaration, the business assumptions underlying the operations
5 projected in the budget are reasonable and are essentially in accordance with the Debtor's historical
6 experience, as adjusted to take into account recent or projected events (e.g., the recent downturn in the
7 economy).  Accordingly, the Debtor believes that the budget establish that the proposed replacement liens
8 being granted to the Lender will adequately protect the Lender's alleged interests.

9        In summary, the Bauer Declaration provides evidence to establish with reasonable certainty that the
10 Debtor's use of any cash collateral of the Lender will result in an increase in the estates' collateral pool,
11 thereby adequately protecting the Lender's interests in any cash collateral.

12            2.    <u>The Lender is Adequately Protected by the Maintenance and Preservation of the</u>
13                 <u>Debtor's Business</u>.

14        To determine the sufficiency of adequate protection, a bankruptcy court should:  (i) establish the
15 value of the secured creditor's interest; (ii) identify the risk, if any, to the value of the secured creditor's cash
16 collateral resulting from the debtor's request for the use of the cash collateral; and (iii) determine whether the
17 debtor's adequate protection proposal protects the value of the cash collateral as nearly as possible against
18 risk to that value consistent with the concept of indubitable equivalence.  <u>McCombs</u>, <u>supra</u>, 86 B.R. at 267
19 (quoting <u>In re Martin</u>, 761 F.2d 472 (8th Cir. 1985)).

20        To establish the value of a secured creditor's interest, the bankruptcy court must consider the
21 purpose of the valuation, and the proposed disposition or use of the secured property.  <u>See</u>, 11 U.S.C. §
22 506(a).  "One of the primary factors to be considered in valuation is whether the subject property is to be used
23 and retained by the debtor or whether the property is to be disposed of."  <u>In re Kidsstop of America, Inc.</u>, 64
24 B.R. 397, 401 (M.D. Fla. 1986).

25        Here, any cash collateral consists of, among other things, the receipts generated by the operations of
26 the Debtor's businesses.  The value of any such cash collateral will depend, in part, upon the preservation of
27 the Debtor as a going concern.  It follows that the risk to this going concern value of cash collateral (which
28 risk is required to be identified by the Court in the <u>McCombs</u> test above) consists of any cessation in the

1   Debtor's business operations.  See, In re Glasstream Boats, Inc., 110 B.R. 611, 612 (M.D. Ga. 1990) (it was

2   in the best interest of both the debtor-in-possession and the creditor that the debtor "continue in its operation

3   as a manufacturing facility" and that "denial of this motion would result in another shut down of the assembly

4   line, which the court doesn't feel is in the best interest of either party."); In re Cann & Saul Steel Co., 76 B.R.

5   479, 483 (E.D. Pa. 1987) (continued operation of manufacturer debtor was in the best interest of secured

6   creditor in that it was likely that the secured creditor would realize more funds than it would by requiring the

7   debtor to cease operations); In re Stein, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (the bankruptcy court

8   allowed a debtor to use cash collateral where the secured party had no equity cushion for protection, finding

9   that the use of the cash collateral was necessary to the continued operations of the debtor, and that the

10  creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]"); In

11  re Pine Lake Village Apartment Co., 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) (debtor permitted to use cash

12  collateral generated from rental income to preserve the value of real property which also secured creditor's

13  claim);  In re Karl A. Neise, Inc., 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor

14  adequately protected by lien in post-petition property acquired by debtors; debtors can use cash collateral "in

15  the normal operation of their business").

16          As discussed in the Bauer Declaration, even a temporary cessation of the Debtor's ability to operate

17  its business, caused by any lack of access to any cash collateral, will result in a substantial diminution of the

18  Lender's collateral, as cattle may become ill or die, feed and medicine could deteriorate, and customers could

19  turn to competitors of the Debtor.  In contrast, maintenance of the Debtor's ongoing operations will preserve

20  the value of the Lender's interest in any cash collateral as nearly as possible against any risk to that value,

21  thus providing adequate protection.

22                                          **V.**

23                  **GOOD CAUSE EXISTS FOR HEARING THIS**

24                      **MOTION ON AN EMERGENCY BASIS**

25          In recognition of the fact that Section 363(c) of the Bankruptcy Code operates to deprive a debtor of

26  the use of critical operating capital as of the filing of the debtor's Chapter 11 petition, Congress specifically

27  provided in Section 363(c)(3) that a hearing on cash collateral "shall be scheduled in accordance with the

28

                                          13

1  needs of the debtor."  Accordingly, the Bankruptcy Code expressly anticipates and authorizes expedited

2  hearings on the issue of cash collateral use.  <u>See</u>, 11 U.S.C. § 363(c)(3).

3      Similarly, the Ninth Circuit Court of Appeals has recognized that immediate interim relief may be

4  crucial to the success of a corporate reorganization:

5

6      <u>We realize that 'in certain circumstances, the entire reorganization effort may be thwarted if
       emergency leave is withheld'</u> and that reorganization under the Bankruptcy Code 'is a

7      perilous process, seldom more so than at the outset of the proceedings when the debtor is
       often without sufficient cash flow to fund essential business operations.'  It is for this reason

8      that Congress specified that hearings concerning the use of cash collateral 'shall be
       scheduled in accordance with the needs of the debtor.'

9  <u>In re Center Wholesale, Inc</u>., 759 F.2d 1440, 1449 n.21 (9th Cir. 1985) (emphasis added) (citations omitted).

10 <u>See</u> <u>also</u>, <u>In re Sullivan Ford Sales</u>, 2 B.R. 350, 355 (Bankr. D.Me. 1980).

11     In this case, the Debtor employs approximately 29 employees in its operations.  As set forth in the

12 Bauer Declaration, the Debtor must have the immediate use of any cash collateral to meet payroll obligations,

13 to meet the daily costs and expenses of operating their business, to promptly pay their vendors, and to

14 acquire goods and services to keep their business operating.  Any delay in the Debtor's ability to meet one or

15 more of the aforementioned operating needs could deprive the Debtor of its ability to successfully reorganize

16 its financial affairs.

17                              **VI.**

18           <u>**THE COURT SHOULD SCHEDULE A FINAL HEARING ON THIS**</u>

19             <u>**MOTION AS SOON AS POSSIBLE IN ACCORDANCE WITH**</u>

20               <u>**THE REQUIREMENTS OF THE BANKRUPTCY RULES**</u>

21     By this Motion, the Debtor is requesting that the Court schedule a final hearing on this Motion as

22 soon as possible in accordance with the requirements of the Federal Rules of Bankruptcy Procedure.

23     Rule 4001 of the Federal Rules of Bankruptcy Procedure provides that the Court may commence a

24 final hearing on this Motion no earlier than fifteen (15) days after service of the Motion.  The Debtor needs to

25 obtain as promptly as possible approval of the final use of cash collateral in order to ensure the Debtor's

26 employees and vendors that the Debtor will be able to pay, during the course of this case, its ordinary

27 operating expenses including, without limitation, payroll and the expenses of maintenance and operation of its

28 business.  A final hearing on this Motion should be held as soon as possible after the expiration of the fifteen

                              14

1  (15) day period provided for by Rule 4001 of the Federal Rules of Bankruptcy Procedure, in order to prevent

2  the substantial damage to the Debtor's business which would result from any loss of support of the Debtor's

3  customers, employees and vendors caused by a lack of confidence that the Debtor will have the ability to use

4  cash collateral during its case.

5

6  **VII.**

7  **THE NOTICE OF THIS MOTION PROPOSED TO BE GIVEN TO**

8  **CREDITORS AND OTHER PARTIES-IN-INTEREST IS APPROPRIATE**

9  **UNDER THE FACTS AND CIRCUMSTANCES OF THE DEBTOR'S CASE**

10     As of the filing of this Motion, no trustee, examiner or Committee has been appointed in the Debtor's

11  Chapter 11 case.  In accordance with the provisions of Bankruptcy Rule 4001(b)(1), notice of this Motion has

12  been given via facsimile, hand delivery or overnight mail to the Office of the United States Trustee, to the

13  Lender, its counsel of record, and to the Debtor's twenty largest general unsecured, non-insider creditors.

14     Because of the exigencies of the Debtor's case and the irreparable harm to the Debtor, its Chapter

15  11 estate, and all parties-in-interest that will ensue if the relief requested herein is not granted, the Debtor

16  submits that no further notice need be given.  No previous motion for the relief sought herein has been made

17  to this or to any other court.

18

19  **VIII.**

20  **CONCLUSION**

21     Based upon the foregoing, the Debtor respectfully request that this Court enter its order:

22     1.     Finding that the Lender's interests in any cash collateral are adequately protected;

23     2.     Authorizing, on an interim basis pending final hearing on notice to creditors, the Debtor's

24          immediate use of any cash collateral of the Lender pursuant to the terms and conditions

25          contained in this Motion;

26     3.     Setting a final hearing on this Motion; and

27     4.     Granting to the Debtor such other and further relief as the Court may deem just and proper.

28

1  Dated: April 21, 2010                          Leslie Cohen Law, PC

2

3                                                         _/s/ Leslie A. Cohen_
                                                    _____
4                                                  Leslie A. Cohen
                                                   [Proposed] Counsel for Debtor and Debtor-in-
5                                                  Possession

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      16

1

**DECLARATION OF PHILIP E. BAUER**

2

I, Philip E. Bauer, hereby declare as follows:

3

1.      I am over 18 years of age. I am the President of Phillips Cattle Company, Inc. (the "Debtor"), the

4
debtor and debtor-in-possession in the above-captioned bankruptcy cases. Unless otherwise stated, I have

5
personal knowledge or information of the facts set forth herein and, if called as a witness, could and would

6
testify competently thereto.

7

2.      I make this declaration in support of the Debtor's Emergency Motion To Approve Use Of Cash

8
Collateral.

9

3.      The Debtor, established in 1968, operates a 100 acre cattle yard and feed mill located in El

10
Centro, California where it processes and sells feed to other cattle dealers, fattens other dealers' livestock,

11
and produces its own livestock for wholesale.  The Debtor's clients consist primarily of other livestock owners

12
and commercial packing houses.  The Debtor does not retail directly to the public.  The Debtor's competitors

13
include other livestock producers such as Brandt Beef.

14

4.      Jerome Bauer is the Debtor's vice president, secretary, and treasurer.  Ross Jenkins, the

15
Debtor's general manager and chief operating officer, runs the day-to-day operations of the Debtor.  Denise

16
Matejovsky, the Debtor's controller, maintains the Debtor's books and records.  Joan Bauer and Sandra

17
Ramalho each own 50% of the Debtor's outstanding common stock.

18

5.      The Debtor operates the cattle yard on land leased from the Philip Himmelfarb Trust.  The

19
Debtor's headquarters is located in Beverly Hills, California in premises leased from Maple Plaza, and its

20
administrative office is located in Imperial, California in premises leased from Western Meat Processors, an

21
affiliated entity.  The Debtor currently employs approximately 29 employees.

22

6.      The Debtor currently has current assets of approximately $8 million which consists primarily of

23
receivables, inventory, and cash on hand. The Debtor currently has liabilities of approximately $19.8 million

24
which consists primarily of notes payable to Wells Fargo Bank ("Wells Fargo").

25

7.      During the nine month period ending January 31, 2010, the Debtor had over $11 million in sales.

26
Based on the Debtor's historical financial performance, I prepared a cash flow budget, which is attached

27
hereto as Exhibit "1."

28

17

8.      The Debtor's financial difficulties were primarily caused by its being defrauded in late 2009 by a large customer, Dwight Mebane ("Mebane").  Previously, the Debtor and Mebane had engaged in business dealings where the Debtor would finance Mebane's purchase of cattle that would initially be placed in Mebane's pastures until the cattle reached a certain weight.  Thereafter, the cattle would be transferred to the Debtor's yard for further feeding until sold to packing houses.  Once sold, the Debtor would remit the sale proceeds to Mebane, less the amount loaned to Mebane and less the amounts due the Debtor for feed provided.  Over the period November 2004 to June 2009, the Debtor loaned $11 million in proceeds from a revolving line of credit from Wells Fargo Bank to Mebane to finance Mebane's purported purchase of 20,000 head of cattle.   In one of Wells Fargo's biennial appraisals of the Debtor's assets in about October 2009, Wells Fargo's appraiser inspected Mebane's pasture in Woody, California and indicated that 5,000 of Mebane's Debtor financed cattle was located there.  After Mebane failed to transfer his cattle to the Debtor for final feeding, the Debtor investigated Mebane's pastures and found none of the supposed 20,000 cattle purchased with the $11 million provided by the Debtor.   The 5,000 cattle Wells Fargo's appraiser indicated he had observed at Mebane's pasture did not bear Phillips' brand and in fact belonged to a third party.  In November 2009, Mebane filed a chapter 11 case that is pending before the U.S. Bankruptcy Court for the Eastern District of California, case no. 09-61122-A-11.  Mebane's fraud has caused the Debtor at least $11 million in losses and has harmed its business.

9.      The Debtor believes that the only creditor that asserts a security interest against the Debtor's cash collateral is Wells Fargo Bank (the "Lender").  On or about October 18, 2007, the Debtor entered into a letter agreement with Wells Fargo under which the Lender agreed to loan and the Debtor agreed to borrow up to $21 million in two revolving lines of credit of $11 million and $10 million each (the "Wells Fargo Loan Agreement"), each under a separate note with a principal balance of up to $11 million and $10 million respectively, due on November 1, 2008, that bears interest at either prime less .5% or LIBOR plus 1.6% (the "Wells Fargo Notes").  The Wells Fargo Notes are secured by a lien on the Debtor's livestock, accounts receivable, and inventory under a security agreement and a livestock security agreement.  The Wells Fargo Loan is guaranteed by the Philip Himmelfarb Testamentary Trust u/t/d 4/9/97.

10.     On or about October 29, 2007, the Debtor entered into an amendment to the Wells Fargo Loan Agreement under which the Lender agreed to loan and the Debtor agreed to borrow up to an additional $1

1  million in a revolving line of credit of $1 million to finance the Debtor's hedging activities with respect to cattle

2  owned by the Debtor's customers, under a note with a principal balance of up to $1, due on November 1,

3  2008, that bears interest at prime less .5% ("Wells Fargo Hedging Notes").  The Wells Fargo Hedging Notes

4  are secured by a lien on certain securities accounts of the under a pledge agreement.  The Wells Fargo Notes

5  and Wells Fargo Hedging Notes are collectively referred to as the Wells Fargo Loan.

6        11.      On or about October 28, 2008, the Wells Fargo Loan was amended to extend the maturity date

7  to November 1, 2009 and on or about October 27, 2009, the Wells Fargo Loan was amended to extend the

8  maturity date to November 1, 2010.

9        12.      As of the Petition Date, the Debtor's collateral balance is as follows:

10            Cash - $140,000
          Accounts Receivable - $3,390,000

11            Inventory - $4,500,000

12        13.      The Debtor proposes to use funds claimed as cash collateral by the Lender in connection with

13  the continued operation of the Debtor's business, in accordance with the provisions of the Debtor's cash flow

14  budget attached hereto as Exhibit "1" to the Bauer Declaration.

15        14.      The budget indicates that the Debtor will operate on a cash flow positive basis during the

16  budgeted period, and that its assets will increase in value during such period.

17        15.      The Debtor believes that the projections of their business operations as set forth in the budget

18  are reasonable.   The business assumptions underlying the operations projected in the budget are reasonable

19  and are essentially in accordance with the Debtor's historical experience, as adjusted to take into account

20  recent or projected events (e.g., the recent downturn in the economy).  Accordingly, the Debtor believes that

21  the budget establish that the proposed replacement liens being granted to the Lender will adequately protect

22  the Lender's alleged interests.

23        16.      Even a temporary cessation of the Debtor's ability to operate its business, caused by any lack of

24  access to any cash collateral, will result in a substantial diminution of the Lender's collateral, as cattle may

25  become ill or die, feed and medicine could deteriorate, and customers could turn to competitors of the Debtor.

26  In contrast, maintenance of the Debtor's ongoing operations will preserve the value of the Lender's interest in

27  any cash collateral as nearly as possible against any risk to that value, thus providing adequate protection.

28

17.    The Debtor employs approximately 29 employees in its operations.  The Debtor must have the immediate use of any cash collateral to meet payroll obligations, to meet the daily costs and expenses of operating their business, to promptly pay their vendors, and to acquire goods and services to keep their business operating.  Any delay in the Debtor's ability to meet one or more of the aforementioned operating needs could deprive the Debtor of its ability to successfully reorganize its financial affairs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 21st day of April 2010 at Beverly Hills, California.

/s/ Philip E. Bauer
Philip E. Bauer

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 506 Santa Monica Blvd. Ste. 200, Santa Monica, California 90401.  On April 21, 2010, I served the within document(s) described as:

**DEBTOR'S EMERGENCY MOTION TO APPROVE USE OF CASH COLLATERAL**

on the interested parties in this action as stated on the attached mailing list.

☐   (BY MAIL) By placing true copies of the foregoing document(s) in a sealed envelope addressed as set forth on the attached mailing list.  I am readily familiar with this firm's practice for collection and processing of correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing contained in affidavit.

☐   (BY EXPRESS MAIL) By placing true copies of the foregoing document(s) in a sealed envelope addressed as set forth on the attached mailing list.  I placed each such envelope for collection and overnight mailing following ordinary business practices.  I am readily familiar with this firm's practice for collection and processing of Express Mail to be sent overnight by the U.S. Postal Service.  Under that practice, it would be deposited on that same day in the ordinary course of business, with Express Mail postage thereon fully prepaid, in a post office, mailbox, sub-post office, substation, mail chute, or other like facility regularly maintained by the U.S. Postal Service for receipt of Express Mail.

☒   (BY OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by Federal Express, an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, true copies of the foregoing document(s) in a sealed envelope or package designated by the express service carrier, addressed as set forth on the attached mailing list, with fees for overnight delivery paid or provided for.

☒   (BY FAX) By transmitting a true copy of the foregoing document(s) via facsimile transmission from this firm's facsimile machine, to each interested party at the facsimile machine telephone number(s) set forth on the attached mailing list.  Said transmission(s) were completed on the aforesaid date at the time stated on the transmission record issued by this firm's sending facsimile machine.  Each such transmission was reported as complete and without error and a transmission report was properly issued by this firm's sending facsimile machine for each interested party served.  A true copy of each transmission report is attached to the office copy of this proof of service and will be provided upon request.

☒   (BY E-MAIL) By transmitting true copies of the foregoing document(s) to the e-mail addresses set forth on the attached mailing list.

I declare that I am employed in the offices of a member of the State Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 21 2010, at Santa Monica, California.

| J'aime Williams | /s/ J'aime Williams |
|---|---|
| (Type or print name) | (Signature) |

**SERVICE LIST**

**BY ELECTRONIC NOTICE**
* Leslie A Cohen leslie@lesliecohenlaw.com, jaime@lesliecohenlaw.com
* United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov

**BY PERSONAL DELIVERY, OVERNIGHT 9AM SERVICE, FAX OR EMAIL**

Hon. Judge Sheri Bluebond
U.S. Bankruptcy Court
255 E. Temple Street, Suite 1482
Los Angeles, CA 90012

Danielle Deutschman
1061 Villa View Drive
Pacific Palisades, CA 90272

Phillips Cattle Company, Inc.
345 N. Maple Drive, Suite 296
Beverly Hills, CA 90210

David Deutschman
1061 Villa View Drive
Pacific Palisades, CA 90272

Office of United States Trustee
725 South Figueroa Street
26th Floor
Los Angeles, CA  90017

Eleanor Bauer Estate
Attn Judy Coulton
5112 Lakeside Drive
Palm Springs, CA 92264

Adrienne Krashin
9005 Glen Court
Fairfax, VA 22031

Imperial Irrigation District
P.O. Box 937
Imperial, CA 92251

Allied National
P.O. Box 29188
Shawnee Mission, KS 66201-9188

Indian Ink
P.O. Box 9254
Amarillo, TX 79105

Baker Commodities
4020 Bandini Blvd.
Vernon, CA 90058

Jenny Krashin
9005 Glen Court
Fairfax, VA 22031

Bank Of America
P.O. Box 45224
Jacksonville, FL 32232-5224

Jerome Bauer
345 N Maple Dr. Ste 296
Beverly, Hills, CA 90210

Bauer Family Trust
Attn: Phil Bauer
345 N. Maple Dr., Ste 296
Beverly Hills, CA 90210

Joan Bauer Estate Trust
345 N. Maple Dr., Ste 296
Beverly Hills, CA 90210

Joseph A. Coulton
69270 Nilda Drive
Cathedral City, CA 92234

Bauer Family Trust
Joan Bauer Farm Account
Attn: Joan Bauer
345 N. Mapble Dr., Ste 296
Beverly Hills, CA 90210

Judy Coulton
5112 Lakeside Drive
Palm Springs, CA 92264

Beth Alexander
1530 5th Street #409
Santa Monica, CA 90401

Nathan Alexander Bauer
345 N Maple Dr. Ste 296
Beverly, Hills, CA 90210

CJ Cattle Co.
Attn: Charles Johnson
636 State Street
El Centro, CA 92243

22

1

2

Nationwide Agribusiness
Attn Allen Tyler
PO box 10491
Des Moines, IA 50306-0491

3

4

Phillip Himmelfarb Testamentory Trust
FBO Joan Bauer
345 N. Maple Dr., Ste 296
Beverly Hills, CA 90210

5

6

Phillip Himmelfarb Testamentory Trust
Attn Sandra Ramalho
345 N. Maple Dr., Ste 296
Beverly Hills, CA 90210

7

8

Phillips Himmelfarb Trust
Attn Phil Bauer
345 N. Maple Dr., Ste 296
Beverly Hills, CA 90210

9

10

11

Rebecca Krashin
9005 Glen Court
Fairfax, VA 22031

12

13

Robert and Ellen Deutschman Family Trust
Attn Robert Deutschman
1061 Villa View Drive
Pacific Palisades, CA 90272

14

15

Robert Bauer
345 N Maple Dr. Ste 296
Beverly, Hills, CA 90210

16

17

Ruth Himmelfarb Great Grandchildren Trust
Attn: Phil Bauer
345 N. Maple Dr., Ste 296
Beverly Hills, CA 90210

18

19

20

21

22

23

24

25

26

27

28

Sandra B Ramalho Trust
PO Box 477
Carpinteria, CA 93013

Stacy Bauer
345 N. Maple Dr., Ste 296
Beverly Hills, CA 90210

Talia Bauer
345 N Maple Dr. Ste 296
Beverly, Hills, CA 90210

Wells Fargo Bank
PO Box 7674
San Francisco, CA 94120

Western Meats DBA Agri Feed Industries
Attn Phil Bauer
PO Box 728
Imperial, CA 92251

Westway
365 Canal Street
Suite 2900
New Orleans, LA 70130

Randy Rogers
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802
rrogers@winston.com

## EXHIBIT 1

Phillips Cattle Company, Inc.
2:10-bk-25276

## CASH COLLATERAL BUDGET

| | 15 DAY | 30 DAY | 60 DAY |
|---|---|---|---|
| | Head CT* | | |
| budget | 12,500 | 12,750 | 13,000 |
| | 4-20 TO 5-5 | 4-20 TO 5-20 | 4-20 TO 6-20 |
| Milling | 75000 | 153000 | 312000 |
| Yardage | 4688 | 9563 | 19500 |
| Medicine | 9100 | 18200 | 36400 |
| TOTAL SALES | 88,788 | 180,763 | 367,900 |
| COGS | | | |
| Medicine | 7000 | 14000 | 28000 |
| Total COGS | 7,000 | 14,000 | 28,000 |
| GROSS PROFIT | 81,788 | 166,763 | 339,900 |
| OPERATING EXPENSES: | | | |
| Repairs & Maintenance | 4000 | 8000 | 16000 |
| Utilities | 4300 | 8600 | 17200 |
| Taxes & Licenses | 750 | 1500 | 3000 |
| Stock Water | 250 | 250 | 500 |
| Yard Rent | 3200 | 6500 | 13000 |
| Fuel | 4250 | 8500 | 17000 |
| Nutrition | 600 | 1200 | 2400 |
| Small Tools & Supplies | 625 | 1250 | 2500 |
| Wages: Labor | 31500 | 63000 | 126000 |
| | 0 | 0 | 0 |
| Total Operating Expenses | 49,475 | 98,800 | 197,600 |
| G & A EXPENSES | | | |
| Accounting | 1250 | 2500 | 5000 |
| Administrative Salaries | 14500 | 29000 | 58000 |
| Bank Services | 300 | 600 | 1200 |
| Insurance    Liability | 2150 | 2150 | 4300 |
| Medical | 3170 | 6340 | 12680 |
| Work comp | 2500 | 5000 | 10000 |
| Office Supplies&Postage | 315 | 630 | 1260 |
| Interest-N/P | 825 | 1650 | 3300 |
| DTN | 310 | 620 | 1340 |
| AFI Rent | 750 | 1500 | 3000 |
| BMW | 415 | 830 | 1660 |
| Telephone | 600 | 1200 | 2400 |
| Utilities | 300 | 600 | 1200 |
| TOTAL G & A Expenses | 27385 | 52620 | 105340 |
| EBITDA | 4,928 | 15,343 | 36,960 |
| OTHER EXPENSES | | | |
| Amortization | | | |
| Depreciation | 8165.5 | 16331 | 32662 |
| Interest-Wells Fargo | 0 | 0 | 0 |
| Taxes | | | |
| Total Other Expenses | 8165.5 | 16331 | 32662 |
| Net Income | (3,238) | (989) | 4,298 |

*These numbers are based on assumptions to acquire future business.
**This does not include cattle profit or losses there is no way to project the profit or losses.